UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
:
BRIAN PEARSON,                                            :
:
                              Petitioner,                 :
:
        - against -                                       :
:
ROBERT ERCOLE, Superintendent, Green                     :
Haven Correctional Facility,                             :
:
                              Respondent.                 :
----------------------------------------------------------X

**MEMORANDUM DECISION AND
ORDER**

CV-06-5315 (BMC)

**COGAN**, District Judge.

Petitioner brings this petition under 28 U.S.C. §2254, challenging his conviction
for second degree murder on two grounds.

First, the Appellate Division held that petitioner's videotaped statement was
improperly admitted at trial. It also held, however, that the admission of the videotaped
statement was harmless error in light of the other evidence against petitioner, including
two signed confessions. Petitioner contends that the Appellate Division unreasonably
applied Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824 (1924), which requires that
to find harmless error, a court "must be able to declare a belief that it was harmless
beyond a reasonable doubt." Since the filing of this petition, however, the Supreme
Court has held that under the AEDPA, the federal court does not re-apply Chapman and
determine the presence or absence of harmless error beyond a reasonable doubt; rather,
the issue on habeas review is whether the error had a "substantial and injurious effect" on
the jury's determination. I find that in light of all of the evidence at trial, the videotaped

statement did not have a substantial and injurious effect on the jury's determination and thus the State Court's application of <u>Chapman</u> was not objectively unreasonable.

Second, petitioner claims that the disclosure of the name and address information for an alleged exculpatory witness was improperly delayed, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963). I find that this claim is procedurally barred. Therefore, the petition is denied.

## **BACKGROUND**

Petitioner was convicted of second degree murder for the November 16, 1998 murder of Eric "Tweety" Steele in Brooklyn. It was not a crime of passion, but a planned execution, the reason for which was never made explicit at trial but may have involved rival drug operations. The State's evidence against petitioner consisted of two written statements signed by petitioner, a videotaped statement, several eyewitnesses, testimony of a medical examiner, and testimony from a police ballistics expert. Both the written statements and the videotape statement were the subject of pre-trial motions to suppress; those motions were denied.

Petitioner made his statements to police detectives when he was in the 73rd Precinct on an unrelated matter. The detective in charge of the investigation, James Algeria, was routinely asking individuals who came into the precinct whether they had knowledge of the Steele murder. When Algeria asked petitioner if he knew anything about it, petitioner responded that he had witnessed it while buying marijuana at a candy store. Algeria stopped defendant from saying anything else, issued <u>Miranda</u> warnings, and obtained both an oral and written waiver of petitioner's rights. Algeria then brought in another detective, Sullivan, and the two of them interviewed petitioner.

1. <u>The First Statement</u>

Petitioner narrated a version of events to Detective Algeria, who wrote it down. Algeria then had petitioner review the written notes, instructing him to make any changes he wanted. After petitioner read the statement, petitioner initialed each page, signed it, and dated it. The statement can be summarized as follows:

A month before Steele's murder, a person named "Little Jus" or "Jus" approached petitioner and told him that he was having a dispute with Steele. Petitioner told Jus that he knew Steele, and the two of them drove around looking for Steele, but could not find him. Jus gave Petitioner a few dollars and his beeper number, and said they would get together again later.

A couple weeks later, Jus and petitioner encountered each other, and Jus asked petitioner if he was ready to kill Steele. Petitioner declined, saying that Jus did not have enough money to get him to kill Steele.

On the morning of the murder, petitioner was outside a barber shop when Jus pulled up in his car and called petitioner over. An individual named Rodney (also referred to in parts of the record as "Rondu") and a third person were also in Jus' car, and petitioner and Rodney got into an argument. Jus pulled a gun and ordered petitioner to get into his car. Jus then pointed the gun at petitioner's chest and threatened him if he did not assist in killing Steele. He offered petitioner $5000 just to point out Steele (he had previously offered him $2500-$3000 when the subject came up a month earlier), and told petitioner to think of a signal to identify Steele. Petitioner agreed to put up his hand and say "what's up" when he saw Steele.

3

Jus let petitioner get out of the car and gave him a .9mm Glock, telling petitioner to give him time to get into position on Hull Street. After waiting a few minutes, petitioner walked over to where he thought Steele would be, saw him, and gave the signal. Rodney then came from around the corner and started shooting at Steele. Steele returned fire, but he was hit and went down in the street. Petitioner and Rodney ran back to Jus' car and got in the back seat. They sped away, with Jus stating an exhortation expressing his satisfaction. Jus dropped petitioner off on Rockaway and Livonia, and petitioner returned the pistol to Jus.

## 2. The Second Statement

When parts of petitioner's story did not fit the ballistics evidence recovered at the crime scene, Algeria and Sullivan decided to re-interview him. After telling petitioner that several things did not fit (Algeria could not recall at trial whether he mentioned specifically what the inconsistencies were), petitioner made a second statement.

Petitioner makes much of the factual inconsistencies between the first and second statements, but the statements are the same in most respects, with the second adding only slightly different detail about Jus' plan to kill Steele. The only material difference is that in the second statement, petitioner admits that as he was running away from the scene to Jus' car after Rodney fired the opening salvo at Steele, petitioner "pulled [his] gun [the .9mm that Jus had given him] and fire[d] about six shots" in the direction of Steele, who by that point was down on the ground.

## 3. The Videotaped Statement

After petitioner made the two written statements, Algeria contacted an ADA, Michael Burke, who arrived at the precinct and took the videotaped statement that is at

issue here. Burke again advised petitioner of his <u>Miranda</u> rights, and petitioner acknowledged that he understood his rights and waived them. What followed may best be described as a negotiating session, as petitioner tried to extract an agreement for "protection" from Burke in exchange for discussing the murder. Petitioner stated several times, in response to whether he would answer questions, "you gotta be able to protect me."[1] After Burke responded that he could not offer protection until he heard what petitioner had to say, petitioner ignored several requests to talk about the incident, giving no response at all. When Burke attempted to prompt petitioner to answer the question of whether he was going to talk, the videotape shows petitioner shaking his head negatively on one occasion. When Burke again asked, "And what happened that day? Want to tell me?," Petitioner responded, "no, I don't want to tell you."

Burke then narrowed his questions to the two statements that petitioner had given to the detectives, asking petitioner whether he had given those statements. In response to that question, and after continuing, unsuccessfully, to bargain for protection, petitioner adopted the first written statement, in which he acknowledged pointing out Steele in order for Rodney to shoot him, and emphatically repudiated the second statement, in which he admitted shooting in Steele's direction.

---

[1] The transcript of the videotape, which is partially quoted in petitioner's brief and given to the jury as an aide but not admitted into evidence, is not entirely accurate when compared to the videotape itself. Several places are transcribed as "inaudible" when, in fact, while petitioner was mumbling, his words can be discerned from the videotape. It may be these "inaudible" references that lead petitioner to argue that the "protection" he was requesting was from the police who had interviewed him, but a review of the video reveals that is clearly not the case. At one point, petitioner says "they [Dets. Algeria and Sullivan] tell me I was gonna be able to talk to the DA and they was gonna be able to protect me." It is clear in context that the protection petitioner was requesting was either from Steele's potential avengers or from Jus if petitioner decided to talk, but not from the police questioning.

## 4. Other Evidence at Trial

None of the eyewitnesses called at trial could identify petitioner, but one of them, Juan Buitrago, testified to witnessing the shooting. He observed two shooters, one of whom fired the last shot at Steele while Steele was on the ground between two vehicles. Buitrago testified that this shooter was short and slim, and wearing a coat, a general description that matched petitioner. Buitrago also testified that he saw this second shooter walk towards Hull Street. Another eyewitness, Moses Olojo, testified that he looked out of his window on Hull Street when he heard gunshots and saw a man run into a white car parked on the street. Olojo described the man as African-American with a dark complexion, a slight build and a navy blue jacket and black pants. A third eyewitness, Sibyl Bowles, confirmed that after hearing gunshots, she saw a man running and entering a car that had been double parked on Hull Street before the shooting.

The Medical Examiner testified that Steele died from four gunshot wounds to the chest, left back, right back, and head. The gunshot to the head was consistent with Steele being positioned lying down, and based on the characteristics of the head wound, the M.E. opined that that shot was fired from virtually point blank range, about 18-24 inches away. A ballistics expert testified that two weapons were fired at the scene, a .380mm and a .44 caliber. He also testified that .9mm and .380mm guns made by the same manufacturer are nearly identical in appearance and can only be differentiated, aside from the ammunition, by small etched writing on the side.

Petitioner's first trial ended in a mistrial when the van carrying the jury had a traffic accident, injuring several jurors. At petitioner's second trial, the jury convicted him of second degree murder.

5. The Brady Claim

Petitioner's <u>Brady</u> claim arises from the prosecution's alleged untimely turnover of the name and address of a potential witness who, petitioner alleges, gave an exculpatory statement to the police. Analysis of this issue is difficult because the witness statement is not part of the record; instead, the facts relevant to this claim can only be pieced together from several snippets of colloquy between counsel and the trial court.

It appears from this colloquy that shortly after petitioner's arrest, a witness named Erving Stokes participated in a lineup and was unable to definitively identify petitioner, possibly saying, "I'm not sure." In response to early discovery requests, the prosecution designated Stokes as a confidential witness and identified him as such (that is, it did not disclose his name or address), stating only that a confidential witness (one of two in the case) had failed to pick petitioner out of a lineup.

At some unspecified time later, the prosecution turned over <u>Rosario</u> material, including a redacted police report stating that Stokes, again identified only as a confidential witness, had been present at the shooting. During jury selection in the first trial, defense counsel requested the identity of the confidential witness, and the prosecutor provided Stokes' name, but not his address, saying that he had been unable to locate Stokes and was therefore unsure whether he would call him as a witness. The prosecutor said that if he could not find Stokes within a matter of days, he would then disclose Stokes' last known address to defense counsel.

Defense counsel maintained that he should have received Stokes' identity and contact information as <u>Brady</u> material much earlier, because Stokes' inability to identify petitioner was exculpatory. The trial court disagreed, holding that an inconclusive lineup

7

did not constitute <u>Brady</u> material. It does not appear that defense counsel urged any ground supporting a <u>Brady</u> claim other than the inconclusive identification.

A colloquy four days later shows that the prosecutor provided the address of Stokes to defense counsel, as promised. Defense counsel then expanded on his <u>Brady</u> objection. According to defense counsel's description of Stokes' statement, Stokes stated that he was standing next to Steele when a lone gunman with two guns approached Steele. Defense counsel argued that since this scenario was inconsistent with the prosecution's theory of two shooters, Stokes' statement was exculpatory, and his identity therefore constituted <u>Brady</u> material that should have been disclosed earlier. The prosecutor responded that Stokes also said in the statement that as soon as he saw the lone gunman, he ran off, and thus did not see any shooting. Therefore, according to the prosecutor, the statement was not exculpatory because Stokes had simply not stayed around to witness the second gunman, and the prosecutor had not been required to make an earlier disclosure of Stokes' name and address.

About ten days later, the first trial ended following the jurors' bus accident. During *voir dire* of the new jury eleven days after that, defense counsel complained that he had been unable to locate Stokes, but that if the prosecutor had turned over the address earlier, he would have been able to find him. He represented that in looking for Stokes, he learned that Stokes had been at the address that the prosecutor had provided as late as a couple of months before, although he did not disclose the basis for that belief. He requested dismissal of the indictment for the alleged <u>Brady</u> violation, which the trial court denied, noting that defense counsel had been alerted to the existence of the witness as a confidential witness "early on," and simply had not been provided with his name and

address. The trial court reiterated its view that Stokes' statement was not exculpatory, and that in any event, defense counsel had sufficient time to try to locate Stokes when the prosecutor provided the name and contact information three weeks earlier.

## **DISCUSSION**

1. The Videotaped Statement Issue

   a. *Standard of Review*

Both parties agree that the State Court, in finding harmless error, disposed of petitioner's claim on the merits, and the State Court decision is therefore accorded deference under the AEDPA. See 28 U.S.C. §2254(d). The parties also agree that the "contrary to" provision of AEDPA does not apply here, as the State Court decision does not directly contradict the governing law as set forth in Supreme Court decisions, and no Supreme Court precedent is based on materially indistinguishable facts. It is thus common ground that the applicable standard on this petition is whether the State Court decision regarding the admission of the videotape constituted an "unreasonable application" of Supreme Court precedent on the issue of harmless error.

A finding of "unreasonable application" of Supreme Court precedent requires something more than legal error. Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003) (citing Williams v. Taylor, 529 U.S. 362, 410-12, 120 S. Ct. 1495 (2000) (O'Connor, J., concurring)). If I conclude that the State Court was wrong, that is insufficient; in order to grant the petition, I must find that the decision was "objectively unreasonable." See Lockyer, 538 U.S. at 75 (rejecting standard of "clear error" as insufficiently deferential). However, the difference between legal error and objective unreasonableness is not great, "otherwise habeas relief would be limited to state court

decisions so far off the mark as to suggest judicial incompetence." <u>Eze v. Senkowski</u>, 321 F.3d 110, 125 (2d Cir. 2003) (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)) (internal quotation marks and citations omitted).

Both parties treat the Second Circuit's decision in <u>Zappulla v. New York</u>, 391 F.3d 462 (2d Cir. 2004), as controlling, notwithstanding the statutory admonition that only Supreme Court, not circuit court, authority is determinative under the AEDPA. <u>See</u> <u>Sellan v. Kuhlman</u>, 63 F. Supp.2d 262, 271 (E.D.N.Y. 1999), <u>aff'd</u>, 261 F.3d 303 (2d Cir. 2001) (under AEDPA, district courts are to follow Supreme Court precedent, not circuit court law interpreting Supreme Court precedent). <u>Zappulla</u> also involved the erroneous admission of a defendant's statement, and held that harmless error review in habeas cases was subject to the standard in <u>Chapman v. California</u>, 386 U.S. 18, 87 S. Ct. 824 (1967). <u>Chapman</u>, which was a direct appeal rather than a habeas case, held that to find error harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." <u>Id</u>.

In <u>Zappulla</u>, the Second Circuit recognized that prior to passage of the AEDPA, the Supreme Court in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993), limited <u>Chapman</u> to direct appeals, expressly excluding habeas cases from the "beyond a reasonable doubt" standard. In its place, <u>Brecht</u> required determination of whether the error "had a substantial and injurious effect or influence in determining the jury's verdict," which is clearly a more forgiving standard than <u>Chapman's</u> "beyond a reasonable doubt." However, based on dictum in <u>Mitchell v. Esparaza</u>, 540 U.S. 12, 124 S.Ct. 7 (2003), a habeas case in which the Supreme Court quoted <u>Chapman's</u> standard approvingly, the <u>Zappulla</u> court concluded that under the AEDPA, <u>Brecht</u> had been

overruled, and Chapman's "beyond a reasonable doubt" standard governed harmless error analysis on habeas review. The Zappulla Court then distilled Supreme Court precedent on the issue of harmless error, including Chapman, and announced four generally applicable evaluative criteria that it applied to its review.

Zappulla, however, is no longer good law. In Fry v. Piller, -- U.S. -- , 127 S.Ct. 2321 (Jun. 11, 2007), the Court unanimously held that Brecht, not Chapman, applies in AEDPA cases reviewing state court application of harmless error analysis, even though the state court must continue to apply Chapman. The Court rejected the precise analysis adopted by the Zappulla Court, namely, that Esparza's application of the AEDPA required a repudiation of the Brecht test for harmless error:

> Petitioner contends that § 2254(d)(1), as interpreted in Esparza, eliminates the requirement that a petitioner also satisfy Brecht's standard. We think not. That conclusion is not suggested by Esparza, which had no reason to decide the point. Nor is it suggested by the text of AEDPA, which sets forth a precondition to the grant of habeas relief, not an entitlement to it. Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief, it is implausible that, without saying so, AEDPA replaced the Brecht standard of 'actual prejudice,' with the more liberal AEDPA/Chapman standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former. Accordingly, the Ninth Circuit was correct to apply the Brecht standard of review in assessing the prejudicial impact of federal constitutional error in a state-court criminal trial.

127 S.Ct. at 2326-27 (citations and quotations omitted).

Putting aside the issue of what effect a circuit court's interpretation of Supreme Court decisions has under §2254(d)(1), see Sellan v. Kuhlman, supra, Zappulla can no longer be relied upon. Its analytical framework – the four questions that it discerned from Supreme Court authority – was based on the "beyond a reasonable doubt standard"

11

derived from Chapman and other direct appeal cases.[2] Its application of that framework to the facts of the case is not reliable because the Court may have come out differently under the more forgiving Brecht standard.

Thus, the parties' vigorous disagreement about whether this case is factually analogous to or distinguishable from Zappulla is not the issue here. Rather, under Fry, to determine whether the State Court's finding of harmless error in this case was objectively unreasonable, the Court must determine whether the erroneous admission of the videotape "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. 619, 631, 113 S.Ct. 1710 (1993) (quoting Kotteakos v. United States, 328 U.S. at 776, 66 S.Ct. 1239 (1946)).

b. *Application*

After viewing the videotape and comparing it to the two written statements and other evidence in the trial record, I cannot find that the videotape had a substantial or injurious effect or influence on the jury. At the outset, I note that, although petitioner characterizes the videotape as a "full confession," he did not confess to shooting in Steele's direction on the videotape, as he had in his second written statement; on the contrary, he rejected the second statement and denied shooting in Steele's direction. The facts of this case are thus in contrast to Zappulla, where the wrongfully admitted statement was an outright confession that the defendant had choked the victim.

In petitioner's first written statement, he did not admit shooting at Steele. He did admit, however, to identifying Steele for Rodney so that Rodney could shoot him. While

---

[2] Although the result of Fry is that the questions that the Zappulla Court derived from Chapman are not an invariable framework that a district court must follow in analyzing a state court's harmless error determination, those questions still may furnish useful considerations in applying the Brecht "substantial and injurious effect or influence" test.

12

petitioner may have believed that his role in pointing out Steele was less culpable than actually shooting him, especially coupled with his claim of duress, the fact remains that he admitted to identifying Steele for the purpose of having him killed, and thereby confessed to the necessary elements of second degree murder. See People v. Moore, 274 A.D.2d 959, 710 N.Y.S.2d 231 (4th Dep't), leave to app. den., 95 N.Y.2d 868, 715 N.Y.S.2d 223 (2000) (State was not required to prove, in prosecution for second-degree murder, whether defendant acted as principal or as accomplice, as elements of crime were the same whether defendant was principal or accessory). When confronted with inconsistencies between the crime scene investigation and his first statement, however, petitioner admitted more active involvement in the crime. Specifically, he admitted firing his gun in Steele's direction as Steele lay on the ground, although he maintained his duress defense based on Jus' alleged threats. In most other material respects, the first and second written statements are consistent.

The question is, then, what did the videotape add to the body of evidence before the jury? The prosecution had already introduced petitioner's two written statements, which cumulatively showed petitioner at the scene, familiar with the players, enlisted by Jus to be part of Jus' plan to kill Steele, pointing out Steele for execution by Rodney, and holding and shooting a gun that matched the physical characteristics of a weapon used in the shooting. The differences in the two written statements showed a clear progression from petitioner's initial attempt to minimize his participation, to later admitting in the face of evidence that made his first statement implausible, that he had fired a weapon at the scene in the victim's direction. In the videotape, petitioner simply rejected the second

13

written statement and adopted the first, in which he claimed he played a more minor role in the shooting.

In that respect, this case falls into the long line of cumulative evidence cases holding that an erroneously admitted confession will constitute harmless error if another similar confession is properly admitted. See Zappulla, 391 F.3d at 468 (Raggi, J., dissenting) (citing cases). Indeed, when petitioner argues that the erroneous admission of a confession is particularly susceptible to a finding of a lack of harmless error because of the inherently damaging nature of confessions, see Ariz. v. Fulminante, 499 U.S. 279, 296, 111 S. Ct. 1246 (1991), he hoists himself on his own petard, because the prosecution's case against him included two properly admitted written confessions.

That is not to minimize the fact that the videotape was not good for petitioner. The prosecution offered it for several reasons, including bolstering the weight of petitioner's written statements; showing that petitioner was associated with the players involved in the murder and was familiar with the scene and the incident; adding "belt and suspenders" to the voluntariness of petitioner's written statements, even though there was no dispute that petitioner had initialed or signed them on each page; and showing petitioner as someone who was "shifty" and capable of changing his story. There is no doubt that a visual depiction of someone whose credibility is in issue adds something to written statements that are taken down by police officers and signed by the suspect. Nevertheless, the fact remains that petitioner's written statements were persuasive evidence against him and were corroborated by additional evidence, as discussed more fully below.

To support his argument that the videotape was crucial evidence against him, petitioner stresses that the tape was forty minutes long and that the prosecutor played it not only during his case in chief, but during closing argument. Although forty minutes of tape may seem like a long time, the fact is that petitioner said precious little during it. Most of the videotape is silent, or consists of the prosecutor's unanswered questions, petitioner's one-word answers, or shows the petitioner, looking tired, rubbing his face. Indeed, the only point in the videotape in which petitioner was more animated was when he stated that his second written statement, in which he acknowledged shooting at Steele, was wrong, and his first statement, in which he admitted pointing out Steele so that Rodney could kill him, was right. The videotape simply did not add much prosecutorial substance to the written statements; in fact, petitioner distances himself in the videotape from the most inculpatory statement that the prosecution offered, i.e., his admission in the second written statement that he shot in Steele's direction.

To further attempt to show that the case against him was weak without the videotape, petitioner exaggerates the importance of inconsistencies in the two written statements, and adds an element of alleged police misconduct in obtaining them. First, the admissibility of the written statements is not in issue, and in any event, there is nothing in the record to support an allegation of police misconduct in obtaining them.

More importantly, I am not persuaded by petitioner's argument that without the videotape, he would have been able to successfully explain away the inconsistent written statements by saying that due to the inconsistencies, neither could be relied upon. It is clear that the primary inconsistency between the two statements – petitioner's admission to shooting in Steele's direction after the police confronted him with evidence that was

inconsistent with his first statement – supports an inference that petitioner was not entirely truthful in his first statement, and that he played a more active role in Steele's shooting than he previously admitted. In the second statement, petitioner continued to minimize his role in the crime by stressing that he participated under duress, but the fact remains that in the face of damaging ballistics evidence, petitioner changed his story to acknowledge firing a gun in Steele's direction, as opposed to claiming not to be a shooter at all.

As a result, although neither written statement tells a complete and accurate story, the statements satisfy the elements of the crime, and the jury was free to draw inferences from the progression from the first to the second version. The admission of the videotape, while undoubtedly probative on the issue of petitioner's credibility, did not have a "substantial and injurious" impact on the jury's determination.

This conclusion is strengthened by comparing the two written statements to the other evidence adduced at trial, which corroborated them in important respects. First, a ballistics expert testified that the gun petitioner admits having at the time of the shooting is consistent with the physical characteristics of one of the guns used in the crime. Second, petitioner admitted that when he shot in the direction of Steele, Steele was lying on the ground, a fact confirmed by eyewitness testimony that the second shooter fired a last shot while Steele was on the ground between two cars. Third, two witnesses identified a vehicle parked on Hull Street in which either one or two shooters fled the scene, which is consistent with petitioner's statements.[3]

---

[3] Considering this evidence, petitioner's reliance on the plurality opinion in <u>Ariz. v. Fulminate</u>, 499 U.S. 279, 111 S.Ct. 1246 (1991), is unavailing. Not only was <u>Fulminate</u> a direct appeal, not a habeas case, and thus decided under the <u>Chapman</u> rather than the <u>Brecht</u> standard, but there, the improperly admitted

Petitioner also argues that the prosecutor's references to the videotape were particularly improper because the prosecutor should have known that there was a high likelihood that the videotape was improperly admitted. This argument derives from Zappulla, but I do not see it reflected anywhere in Supreme Court authority. This is not a prosecutorial misconduct case. Under the Supreme Court's recent decision in Fry, the test remains whether the admission of the evidence had a substantial and injurious effect on the jury's determination. The use to which a prosecutor puts the improperly admitted evidence will likely bear on that determination, but no Supreme Court authority suggests that harmless error analysis includes a sanction against prosecutors for not having adequately predicted that a trial court's order would be reversed on appeal. A prosecutor must be able to rely on orders of the trial court sustaining the admission of evidence; to expect him to hold back because of the possibility of reversal, and if to hold back, how much, would introduce an entirely unrealistic and impractical element to the conduct of criminal prosecutions.

Moreover, even if a prosecutor's prognostic ability as to appellate review of suppression hearing orders was a factor in harmless error analysis, any lack of foresight by the prosecutor here was not egregious. Indeed, while this case is controlled by the Appellate Division's finding that the videotape was improperly admitted, a strong argument could be made to the contrary. Although the Appellate Division concluded that petitioner "repeatedly and unequivocally ... invoked his right to remain silent," I believe, based on a review of petitioner's statements in the context of his attempt to negotiate with

confession was the defendant's first confession, and the second confession made little sense when it was removed from the context of the first. Because the second confession could not stand alone, the Court found that the erroneous admission of the first confession was not harmless error. In the instant case, petitioner's two written statements were obtained prior to the videotape statement, and thus did not depend upon it in any way.

17

the prosecutor for "protection," see Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990), that conclusion is far from clear. The points at which petitioner expressed a disinclination to answer questions could reasonably be viewed either as a refusal to answer particular questions, or as part of his attempt to bargain for protection from street retaliation in exchange for talking, rather than as an unambiguous invocation of his right to remain silent. The suppression court sustained admission of the videotape on precisely that basis.

Petitioner relies heavily on the language from Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S. Ct. 1602 (1966), stating that "if the individual indicates in any manner, at any time prior to or during interrogation, that he wishes to remain silent, the interrogation must cease." However, most federal courts, in light of Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350 (1994), which requires an unequivocal invocation of the right to counsel, have similarly held that only an unequivocal invocation of the right to remain silent is sufficient to trigger that right. In Kirk v. Carroll, 243 F. Supp.2d 125 (D. Del. 2003), for example, after being advised of his Miranda rights and being asked if he wanted to talk, the petitioner stated "I don't have anything to tell you. ... You know, what I really want to do is, if I'm going to be charged, just go ahead and get it over with. ... Just take me away, please. Take me away." The District Court denied habeas relief, stating:

> The statement in Davis was 'Maybe I should talk to a lawyer,' which the
> Supreme Court found ambiguous. Additionally, in a similar case, the
> Fourth Circuit found that the admittance of statements following the
> statement 'I don't think I should say anything,' in the context of the right
> to remain silent was not contrary to established federal law as determined
> by the Supreme Court. Burket v. Angelone, 208 F.3d 172, 200 (4th Cir.
> 2000). In sum, the Court concludes that the statements made by Petitioner
> did not amount to Petitioner invoking his right to remain silent, and

therefore, the admission of the statements into evidence at Petitioner's trial was not contrary to clearly established federal law as determined by the Supreme Court.

Id. at 133. See also U.S. v. Ferrer-Montoya, 483 F.3d 565, 569 (8th Cir. 2007) (declining to answer certain questions but answering others does not constitute an invocation of right to remain silent); U.S. v. Sherrod, 445 F.3d 980, 982 (7th Cir. 2006) ("[n]ot going to talk about nothing" in response to questioning was not an invocation of the right to remain silent); Thomas v. Lamarque, 121 Fed. Appx. 220, 222 (9th Cir. 2005) ("we're done" in response to questioning "was not an unambiguous and unequivocal invocation of [petitioner's] right to terminate questioning"); U.S. v. Thomas, 358 F. Supp.2d 1100, 1101 (M.D. Ala. 2005) ("I won't say where I got [the stolen money orders]" did not invoke right to remain silent, where at no time did defendant "refuse... to answer *any* further questions, and at no point did he state that he wished questioning *as a whole* to cease) (emphasis in original)).

It is arguable here that petitioner went one step further than these cases, shaking his head negatively and once saying "no" when asked if he was going to tell the ADA what happened on the day in question. But when viewed in the context of bargaining for protection, which is the main theme that emerges from this portion of the videotape, and the lack of an unambiguous invocation of his rights, the case is close enough that the ADA's decision to proceed with questioning was not patently unreasonable.

In U.S. v. Mikell, 102 F.3d 470 (11th Cir. 1996), the Court noted that under pre-Davis law, when faced with an ambiguous statement that might or might not reflect an attempt to invoke the right to remain silent, investigators were limited to such follow-up inquiry as might cure the ambiguity, rather than continuing general questioning. The

Second Circuit has long applied the same rule. See Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989). In Mikell, however, the Eleventh Circuit held that Davis effectively abrogated this rule; in its place, Davis established a rule that an ambiguous invocation of rights was the equivalent of no invocation of rights at all:

> The Supreme Court's decision in Davis …changed this 'clarification only' rule. In Davis, the Court held that a defendant must articulate his desire to have counsel present with sufficient clarity so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. 512 U.S. at --, 114 S.Ct. at 2355. 'If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.' Id. at ----, 114 S.Ct. at 2356. In light of this ruling … [i]f the statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation. Id.
>
> In this case, it is undisputed that, after Mikell was informed of his Miranda rights, he was informed by the interrogating officers that he could stop answering the questions at any time. In addition, it is uncontroverted that the officers told Mikell that, if he did not want to answer a particular question, he did not have to do so. At no time during the interrogation did Mikell indicate that he wanted the questioning to cease. He simply refused to answer certain questions, by either remaining silent or shaking his head, while continuing to answer other questions.
>
> Pursuant to Davis, we hold that a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that he wishes the questioning to cease. … Because Mikell did not clearly request that the questioning stop, the district court did not err in denying his motion to suppress.

102 F.3d at 476-77.

It is not clear whether the Second Circuit would agree with this analysis. In U.S. v. Ramirez, 79 F.3d 298 (2d Cir. 1996), it seemed to interpret Davis similarly, and, assuming arguendo that Davis applied to a waiver of the right to remain silent, held that a defendant's silence as to two questions "did not require the cessation of questioning since

his silence certainly did not constitute a 'clear' request that all further questioning cease."
The Court also quoted Campaneria approvingly as limiting follow-up questioning in an ambiguous invocation situation to clarifying questions. However, because the Ramirez Court held that mere silence did not rise to the level of even an ambiguous invocation, and also because it assumed without deciding that Davis applies in the right-to-remain-silent context, Second Circuit law is not definitive as to whether only clarifying questions are allowed when a suspect makes an ambiguous or equivocal invocation.[4]

The New York Court of Appeals has not addressed the impact of Davis. However, the intermediate appellate courts that have considered it have viewed it as eliminating the requirement that police limit their questioning to clarifying questions when a suspect makes an ambiguous invocation of rights. See People v. Lopez, 3 A.D.3d 455, 456, 770 N.Y.S.2d 854 (1st Dep't 2004) ("Defendant's remark did not obligate the interviewing prosecutor to make any clarifying inquiries," citing Davis), leave to app. den., 3 N.Y.3d 643, 782 N.Y.S.2d 414; cf. People v. Morton, 231 A.D.2d 927, 928, 647 N.Y.S.2d 897, 899 (4th Dep't 1996) (defendant's statement that "'he really didn't want to discuss the other robberies because he was still on parole,' did not constitute an unequivocal assertion of his right to remain silent. That right is not asserted where a defendant merely refuses to answer specific questions or expresses a desire to avoid certain areas of inquiry," citing Davis).

Ultimately, given the state of the law and the nature of the questioning, I cannot fault the prosecutor for exploiting evidence that the trial court deemed admissible. If

---

[4] Petitioner makes much of his silence and pauses in response to some of the ADA's preliminary questions. Ramirez demonstrates that such actions do not constitute even an equivocal invocation of the right to remain silent.

there is some case in which a prosecutor should be aware that he "got away with something" and a decision in his favor was likely to be reversed on appeal such that his decision to use the evidence might factor into harmless error analysis, this is not that case.

Petitioner makes two other arguments, again based on Zappulla, that are without merit. First, he notes that, like Zappulla, this was petitioner's second trial; therefore, he argues, this shows the weakness of the prosecution's case. This is a disingenuous argument. Unlike in Zappulla, the mistrial here occurred because the jury in the first trial was in a traffic incident while in transport, injuring several jurors. That reveals nothing about the strength or weakness of the prosecutor's case.

Second, petitioner argues that the length of the jury's deliberation before convicting him also shows, as in Zappulla, the weakness of the prosecutor's case. That argument is also unpersuasive. The jury convicted petitioner after deliberating from mid-afternoon on the first day to the morning of the second day. If anything, under Zappulla, that relatively short time frame would support a finding that the prosecutor had a strong case, but I have not drawn that conclusion. It is speculative at best to assign probative value to the length of a jury's determination as an indicator of the strength of the prosecution's case. A single tentative, confused or unreasonable juror can cause not only lengthy deliberation, but a deadlock. A federal court's determination of whether a state court was objectively unreasonable in finding harmless error must be based on a review of the entire record, not speculation about what might have taken place in the jury room.

I recognize that the prosecutor sought every advantage from the videotape once it was admitted, and that a videotape of a defendant's statements can be particularly strong

22

evidence. See Campaneria, 891 F.2d at 1022. However, given petitioner's admission to the elements of murder, either as principal or accessory, in his written statements; the reduced probative value of this videotape compared with statements that contain outright confessions; the fact that the videotaped statement contradicted the prosecution's case in some respects; and the witness testimony that corroborated important details in the petitioner's written statements, I conclude that the videotape statement did not have a substantial and injurious effect on the jury's determination.

2. The Brady Issue

Respondent argues that based on the decision of the Appellate Division, petitioner's Brady claim based on the failure of the prosecution to disclose Stokes' name and address earlier is procedurally barred. The issue arises from the Appellate Division's somewhat unusual phrasing in disposing of the issue. After discussing and rejecting petitioner's claim regarding the videotaped statement, the Appellate Division stated that petitioner's "remaining contentions ... are either unpreserved for appellate review, without merit, *or based on material that is dehors the record*" (emphasis added).

In Jiminez v. Walker, 458 F.2d 130 (2d Cir. 2006), the Second Circuit clarified the framework for determining whether a procedural bar exists when the Appellate Division uses disjunctive language. The test the Second Circuit laid out was as follows:

> [W]hen examining the basis of a state court's adjudication of a federal claim, a federal habeas court in this circuit should examine the three clues laid out in Coleman, Quirama, and Sellan to classify the decision as either:
>
> (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2) fairly appearing to rest primarily on state procedural law.

> Absent a clear and express statement of reliance on a state procedural bar, the Harris presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim. Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications 'on the merits' under 28 U.S.C. § 2254(d). The Harris presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar. Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar. No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

458 F.3d at 145 (citation omitted). The "three clues" to which the Court referred were: "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." Id. at 145 n.16.

Post-Jimenez, the Second Circuit has recognized that in the usual case, the use of disjunctive language will lead to the conclusion that the Appellate Division decision was on the merits. See Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006); Vilsaint v. Burge, No. 03-cv-3653, 2007 WL 1074917, at *4 (E.D.N.Y. Apr. 5, 2007). This does not mean, however, that courts may ignore the analytical framework at which the Second Circuit so painstakingly arrived in Jimenez. It simply means that in one situation, albeit the most common situation, the courts have done the analysis and it leads to the conclusion of a merits decision.

Petitioner misinterprets Jiminez. He selectively quotes it for its discussion of earlier cases, such as Fama v. Commission of Correctional Servs., 235 F.2d 804 (2d Cir. 2000), which eschewed the use of "clues" and suggested an invariable determination of no procedural bar when the Appellate Division uses disjunctive language. However, as

the Jiminez language quoted above indicates, the automatic result reached in cases like Fama is no longer the procedure that governs determination of whether a procedural bar exists. The "three clues" are very much a part of the analysis.

Thus, in the instant case, the first step is to determine whether the Appellate Division's decision fairly appears to rest primarily on federal law or be interwoven with federal law or, by contrast, if it fairly appears to rest primarily on state procedural law. The first "clue" to that determination is the face of the decision.

Looking at the face of the Appellate Division's decision, if it had simply said, as such decisions often do, that petitioner's claims were "either unpreserved for appellate review or without merit," that would likely end the inquiry as a practical matter under Jiminez. There is no discussion of the Brady claim in the decision, and if the court used the simple "either/or" language, there would be no basis for concluding that it was procedurally barred as opposed to being decided on the merits. Here, however, the Appellate Division said more. It asserted that the claim was "either unpreserved for appellate review, without merit, *or based on the material dehors the record*" (emphasis added). This last clause is significant, because it shows that the Appellate Division made a finding of a specific procedural defect. To determine if it was referring to the Brady claim, we need to look at the other two "clues."

The record reveals that the only claim that the State argued was based on material outside the record was the Brady claim. The State's argument was based on the fact that neither the Stokes statement nor a full exposition of the facts surrounding it were in the record. Therefore, the State suggested, it would be difficult, if not impossible, to determine solely on the basis of a colloquy between counsel and the Court whether earlier

identification of Stokes' name and address would have been favorable to petitioner, and whether petitioner was prejudiced, as <u>Brady</u> requires. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936 (1999) (<u>Brady</u> violation requires proof that (1) the evidence at issue is favorable to the accused; (2) the State suppressed the evidence; and (3) the defendant was prejudiced). Petitioner raised a number of additional claims on appeal, of which only the videotaped confession claim is asserted here, but the State argued only that the <u>Brady</u> claim was based on material outside the record. Thus, under <u>Jiminez'</u> second "clue," the Appellate Division was aware of a specific state procedural bar when it used the language "based on material dehors the record."

The third <u>Jiminez</u> factor requires consideration of the practice of state courts in similar circumstances. This factor is analogous to the standard under which a federal court considers whether it will accept a finding of a state procedural bar: "a [state] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed by the state in question.'" <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999) (quoting <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24, 111 S.Ct. 850 (1991)).

It is well established in New York practice that claimed errors that require consideration of evidence outside of the record are not properly raised on direct appeal. Instead, a defendant is required to pursue a motion under §440 of the New York Criminal Procedure Law. Section 440.10(1)(f) specifically allows for such a motion when a defendant seeks to vacate his conviction on the ground of "improper and prejudicial conduct not appearing on the record." Cases raising <u>Brady</u> issues that depend in part on off the record material are regularly heard under §440. <u>See, e.g.</u>, <u>People v. Nichols</u>, 35

26

A.D.3d 508, 826 N.Y.S.2d 359 (2d Dep't 2006); People v. Broxton, 34 A.D.3d 491, 824

N.Y.S.2d 127 (2d Dep't 2006); People v. Philips, 30 A.D.3d 621, 817 N.Y.S.2d 373 (2d

Dep't 2006); People v. Joseph, 8 A.D.3d 61, 777 N.Y.S.2d 642 (1st Dep't 2004); People

v. Hendricks, 4 A.D.3d 798, 771 N.Y.S.2d (4th Dep't 2004); People v. Harris, 1 A.D.3d

881, 767 N.Y.S.2d 725 (4th Dep't 2003); People v. Drossos, 291 A.D.2d 723, 738

N.Y.S.2d 724 (3d Dep't 2002).

When a defendant attempts to raise a Brady claim on direct appeal concerning

matters that are outside the record, the New York courts almost invariably reject the

appeal, remitting the defendant to a §440 motion, if one is available. See People v.

Williams, 34 A.D.3d 856, 824 N.Y.S.2d 681 (2d Dep't 2006); People v. Dukes, 284

A.D.2d 236, 726 N.Y.S.2d 554 (1st Dep't 2001); People v. Wilson, 283 A.D.2d 339, 727

N.Y.S.2d 62 (1st Dep't 2001); People v. Bailey, 275 A.D.2d 663, 713 N.Y.S.2d 535 (1st

Dep't 2000). If the Brady issue concerns matters that are dependent on material off the

record but also involves material on the record, the New York courts still require a §440

motion, which they will consolidate with the direct appeal. See People v. Ennis, --

A.D.2d -- , 2007 WL 1775227 (1st Dep't Jun. 21, 2007); People v. Ortega, 40 A.D.3d

394, 836 N.Y.S.2d 144 (1st Dep't 2007); People v. Barnes, 29 A.D.3d 390, 814 N.Y.S.2d

162 (1st Dep't 2006); People v. Stein, 10 A.D.3d 406, 781 N.Y.S.2d 654 (2d Dep't

2004); People v. Tran, 308 A.D.2d 497, 764 N.Y.S.2d 636 (2d Dep't 2003). Thus, the

requirement of raising Brady claims that depend at least in part on off the record material

is firmly established and regularly followed.

Accordingly, all three of the Jiminez "clues" point in favor of the conclusion that

the Appellate Division, when it stated that a claim was "based on material dehors the

record," was referring to petitioner's <u>Brady</u> claim. I therefore find that the Appellate Division's conclusion as to the <u>Brady</u> claim fairly appears to rest primarily on state procedural law. Alternatively, if the holding is viewed as resting primarily on the merits, the Appellate Division's statement that it was rejecting the claim because it was "based on material dehors the record" constitutes a clear statement of reliance on a state procedural bar. Either way, there is an adequate and independent state law ground that precludes habeas corpus relief.

Petitioner argues that by stringing together bits of colloquy from several exchanges during his first trial and other exchanges during his second trial, a clear enough record emerges concerning the <u>Brady</u> issue so that the matter could have been ruled upon on direct appeal. This argument fails for two reasons. First, once it is determined that the Appellate Division invoked a state procedural bar, the federal habeas court is not free to conduct a *de novo* examination of that determination. The issue is whether the procedural bar is firmly established and regularly followed. As suggested above, the third <u>Jiminez</u> factor, if answered affirmatively, effectively compels that conclusion.

Second, the Appellate Division would have been engaging in guesswork if it reached the <u>Brady</u> issue. The advantage of a §440 motion is that it allows the court to develop a full record on the alleged error, and even conduct an evidentiary hearing, if necessary. Here, the police report referring to Stokes that gave rise to the <u>Brady</u> claim based on the prosecution's failure to identify Stokes' name and address was not in the record. There is no reference in the record regarding why defense counsel, who apparently knew of two witnesses' inability or limited ability to identify petitioner in a

lineup, took no action for some period of time (the amount of which is also not in the trial record) to follow up on the disclosure and obtain the witnesses' names and contact information until *voir dire* during the first trial.[5] There is also no discussion of whether the prosecution acted reasonably in designating Stokes as a confidential witness, thus withholding his identity until *voir dire*, or whether it undertook reasonable efforts to locate him. Moreover, although petitioner assumes *arguendo* in his petition that Stokes did not completely fail to identify petitioner in the line-up, but simply stated, "I'm not sure," the Appellate Division had no such concession from petitioner's trial counsel, whose position on the record regarding the statement was that Stokes had conclusively failed to identify petitioner.

Finally, to the extent the <u>Brady</u> issue is reflected on the record, it is only there through the backdoor, so to speak. Defense counsel did not initially move to dismiss on <u>Brady</u> grounds based on the prosecution's failure to identify Stokes and provide contact information. Instead, when defense counsel attempted to cross-examine Detective Algeria using Stokes' failure to pick petitioner out of a line-up, the trial court sustained the prosecutor's hearsay objection. In the ensuing sidebar, defense counsel argued that if the Court was going to continue to sustain the hearsay objection, and "*if* I'm not able to locate Mr. Stokes, I renew my arguments in that regard ... and would move for a dismissal of the charges against my client now, and again at the appropriate time" (emphasis added). It is unclear what defense counsel was "renewing," because while he

---

[5] <u>See</u> <u>Bonilla v. Portuondo</u>, No. 00 Civ. 2369, 2004 WL 350694 (S.D.N.Y. Feb. 26, 2004), where the Court stated:

> [O]nce [defense counsel] found out that a 911 tape existed, he took no affirmative step to obtain the transcript. Since defense counsel knew of the essential facts that would have permitted him to obtain a copy of the 911 tape and transcript, that evidence cannot be considered withheld, and, consequently, no <u>Brady</u> violation occurred.

had stated his position that Stokes' contact information was <u>Brady</u> material during a couple of earlier colloquies, he had not asked for any relief other than what the Court ordered, namely, that the prosecution turn over Stokes' contact information. It also does not appear that the argument came up again at any later "appropriate time."

A proper consideration of the <u>Brady</u> challenge therefore required more of a record than the one before the Appellate Division. Applying <u>Brady's</u> three requirements, the record does not permit an informed conclusion as to whether an earlier identification of Stokes' name and address would have resulted in favorable evidence for the petitioner, or whether the prosecution should be charged with suppressing the evidence. Because the first two issues present no clear answer, the court cannot properly determine whether the accused was prejudiced. The Appellate Division's conclusion that the <u>Brady</u> challenge relied on material off the record and therefore must be raised by §440 motion was a firmly established and regularly followed procedure under New York law.

## CONCLUSION

The petition is denied. A certificate of appealability shall issue with regard to the videotaped confession issue only. 28 U.S.C. §2253(c).

**SO ORDERED.**                              /s/(BMC)

_____
U.S.D.J.

Dated: Brooklyn, New York
      July 2 9 , 2007